UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re: the Complaint and Petition of the United States of America in a Cause for Exoneration from or Limitation of Liability with Respect to DHS-CB[ Vessel M382901 (M901) re: the Collision with an Unnamed Panga Smuggling Vessel on or about June 18, 2015. | Case No. 15cv2626 JM(RBB)<br><br>STATEMENT OF DECISION |

This Statement of Decision follows a two day bench trial which began on May 23, 2018, and was taken under submission following the June 7, 2018 filing of supplemental briefing. The court has considered all the papers filed by the parties, all of the evidence received during and after trial, and the arguments of the parties. The court's Statement of Decision follows.

This case consists of an admiralty action brought by the United States of America ("Government") for exoneration of liability under the Limitation of Liability Act ("LOLA"), 46 U.S.C. §§ 30505, et. seq., following claims brought by the Estate of Graciela Lopez Franco, Marta Franco Jimenez, and Trinidad Lopez-Hernandez ("Franco claimants"), as well as claims brought by Hector Lopez Garcia and Luis Lopez Garcia ("the Garcia claimants"). The claims are brought against the Government for wrongful death and negligence arising out of a June 17, 2015 collision between a 38-foot United

States Border Patrol vessel and a 'panga' type vessel smuggling undocumented persons from Mexico into the United States.

The court has previously ruled that any liability on the part of the Government is subject to the Suits in Admiralty Act ("SAA"), 46 U.S.C. §§ 30901, et. seq.[1], and the Death on the High Seas Act ("DOHSA"), 46 U.S. C. §§ 30301, et. seq.

Under LOLA, the limitation "claimants" (analogous to plaintiffs in standard litigation) have the initial burden of proving negligence under admiralty law which in this case is tantamount to a maritime tort action. If the claimants fail to establish liability based upon a showing of duty, breach of duty, causation, and damages, then the shipowner, here the Government (i.e., the plaintiff in limitation), is entitled to exoneration.

## CONTENTIONS OF THE PARTIES

All claimants primarily claim that the interdiction of the panga in which they were being smuggled into the United States was negligently conducted by the Border Patrol agents aboard the Border Patrol vessel. Essentially, claimants argue that under a totality of circumstances standard, the agents acted too quickly when allowing only 94 seconds to elapse between initial hailing efforts (lights, siren, etc.) and disabling the panga engine by gunfire, thereby causing the collision between the two vessels.

The Franco claimants further contend the agents were negligent in their failure to rescue Ms. Franco from drowning after she was trapped under the capsized panga.

The Government submits its agents at all times complied with the statutory and guideline standards governing its interdiction of the panga by using force expressly authorized under the circumstances.

Finally, the Government argues the collision between the vessels was caused by the panga, not by any negligence of the agents, and that the drowning of Ms. Franco was not the result of any wrongdoing by the agents in the chaotic aftermath of the collision.

[1]The relevant provisions of the SAA are incorporated into the Public Vessels Act (PVA), 46 U.S.C. §§ 31101, et. seq., which provides for a limited waiver of governmental sovereign immunity.

The Franco claimants seek an award of $1 for the death of Ms. Franco and the Garcia claimants seek unspecified damages for personal and emotional injuries sustained in the collision. The Government disputes any of the claimants are entitled to recover damages.

## EVIDENTIARY RECORD

### Testimony of Christopher Hunter[2]

On June 17, 2015, Christopher Hunter, a supervisory marine interdiction agent with United States Customs and Border Protection ("CBP"), assigned to the "small boat interdiction program" ("SBIP") was the vessel commander ("VC") of a 38-foot SAFE boat identified as public vessel M901 ("M901"). Marine interdiction agents Craig Jenkins and Arian Linscott were the two other crew members aboard the M901.

On June 17, 2015, a "panga" type vessel with multiple persons onboard was observed by United States aircraft off the coast of Baja, California, Republic of Mexico.[3] The panga was further tracked as it entered the United States' territorial waters. Sometime before 2:00 a.m. on June 18, the M901 spotted and tracked the panga to a point somewhere off the coast of Encinitas, a coastal city within the County of San Diego. At the time, it was very dark with no moonlight and a low-hanging marine layer. The plan of the M901 crew was to interdict the panga at a location approximately twelve miles off the coast.

Approximately five minutes before the eventual collision between the two vessels, the crew of the M901 saw the panga at a distance of about twenty-five yards. Supervisor Hunter observed a 25-30 foot long panga type vessel with a low profile, a single outboard engine, and a steering device near the stern.

/ / /

---

[2]Supervisor Hunter's testimony as summarized has been augmented by undisputed facts and this Court's undisputed findings in previous orders. Hunter will be later (and intermittently) referred to as vessel commander ("VC").

[3]There is no dispute that the panga passengers were undocumented immigrants as buttressed by the testimony of several of the passengers.

15cv2626

At trial, Supervisor Hunter testified that to the best of his recollection he did not hear any M901 crew member shouting commands at the panga over the loudspeaker or hailer, including any order to stop. Such would have been futile with the siren activated and sounds from the water hitting the vessel.

The crew initially used emergency lights and a siren in an effort to stop the panga. After the M901 came alongside the panga with lights and siren activated, Supervisor Hunter noticed the driver of the boat, in a yellow slicker, look at the M901 and then accelerate and turn away. Supervisor Hunter then gave an order to "stand by" or "initiate" warning shots. This order authorized the use of marine warning shots ("MWS") consisting of two "flare"-like shots from an 870 Remington shotgun in compliance with interdiction protocol. The flare has a loud report with a "fireworks-like explosion" at the end. Supervisor Hunter saw the muzzle flashes and heard the reports of the MWS. The "shooter" called out, "two good." Observing no reaction of the panga to the MWS, Supervisor Hunter's next orders were to "stand-by disabling fire," and "fire."

After the decision was made to disable the panga with marine disabling shots ("MDS"), Supervisor Hunter moved to a tactical assessment position ("TAP") where contact with a subject vessel begins. The goal is to pursue the vessel from behind and outside its wake, ultimately achieving a parallel or ninety degree course alongside the pursued vessel such that its engine may be "shot out" from very close range. A pre-loaded shotgun with two shots is the standard firearm to be used in disabling a vessel engine. A "shooter" is designated for the task with the remaining crew member designated as a "cover" officer. These enforcement tactics require specialized training and involve policies and procedures governing proper shooting and disabling and tactical boarding. While MWS are taken from a position away from a panga, MDS are taken from a closer position to increase the likelihood of hitting the target.

Once in his TAP, Supervisor Hunter gave the disabling fire order. Before MDS were fired, the panga peeled away to the right, breaking the 90 degree angle. Once the M901 regained the 90 degree angle, one MDS round was fired and perhaps a second

15cv2626

round. Within a few seconds, the panga made a drastic left turn into the M901 with a hard impact, causing the M901 to shudder. The panga continued to dive under the M901, which was still moving forward. The M901 then "passed" over the panga with Supervisor Hunter noticing the speed of the M901 had decreased from 28 mph to 7.6 mph.

After impact, Supervisor Hunter looked back to see the panga capsized and decided "to back down" to the panga. People were frantically swimming toward the M901 and being rescued. The M901 called for help.

As Supervisor Hunter described it, "It was chaos. People were frantic, clinging to items, even with life jackets on. Life rings and heaving lines were thrown to people farther out and people were pulled into the M901." Supervisor Hunter noticed one person sitting atop the capsized panga hull and would not let go. Eventually, he agreed to let go and come aboard the M901. Minutes later, Agent Linscott shouted, "Hey, there's supposed to be twenty. Someone's missing." After the panga was partially lifted to see under the boat, Supervisor Hunter saw a foot. A body [that of Ms. Franco] was removed from under the panga and taken aboard the M901 where Agents Linscott and Jenkins administered CPR for approximately 30 minutes without resuscitating Ms. Franco.

The elapsed time between the activation of lights and siren aboard the M901 and the disabling of the panga's engine was approximately one and a half minutes.

**Testimony of Craig Jenkins**

Craig Jenkins, an experienced CBP marine interdiction agent with SBIP training, was the designated cover officer during the June 18, 2015 interdiction of the panga. Agent Jenkins testified it was he who operated the "sound devices" and that before using MWS, all available means to hail a vessel should be used. He had used verbal directions in the past, although sirens should always be used in a "case such as this." Agent Jenkins testified policy does not dictate whether or when to use voice versus siren.

/ / /

Agent Jenkins did not use the loud speaker to order the panga to stop and can not recall if anyone else did.

Agent Jenkins heard the MDS and almost immediately thereafter felt the collision between the panga and the M901. The panga went under the M901 and he noticed the panga capsized about 30 seconds later. It took an additional 30 seconds to back into the area of the panga. At some point, a man on top of the panga told Agent Jenkins that a woman was under the boat. Agent Jenkins told the man to get the person out from under the boat, but the man did not react. Agent Jenkins was aware there existed a danger of the person drowning but was also involved in bringing other distressed people into the boat. Moreover, Agent Jenkins testified, "We're told that to go into the water will increase [our] risk," and that "jumping into the middle of all the passengers would be an incredible risk." It was important to remove all people from the water as quickly as possible to avoid crushing injuries from the boats coming together, as well as injuries from the M901 propellers that were still running.

After all the people were secured in the M901, the M901 crew still needed help from some people to lift the panga and bring the woman aboard. A weak pulse was detected and multiple rounds of CPR were unsuccessful in reviving Ms. Franco.

**Testimony of Arian Linscott**

Marine interdiction agent Arian Linscott was the designated "shooter" aboard the M901 on June 18, 2005. In all three prior cases in which he was so designated, the vessels had yielded without the necessity of MDS. Agent Linscott acknowledged that 94 seconds had elapsed between activation of lights and siren and the collision, and that MWS were fired within 30 seconds of the first sighting of the panga. Agent Linscott does not recall speaking to anyone over the M901 loudspeaker.

With respect to the use of MWS and MDS, Agent Linscott recalls advising Supervisor Hunter that he had fired "two good" warning shots to which Supervisor Hunter replied, "stand by disabling." Agent Linscott recalled firing three MDS in total. The first did not disable the panga, but the following volley of two shots did. They were

taken about four feet from the engine with Agent Linscott leaning in even closer, and with the closest passenger about seven feet from the engine.

After the volley, the panga made a hard right and then a hard left, colliding with the M901.

After the collision, the panga capsized. Agent Linscott helped to pull people out of the water, all of whom wore life jackets. Someone came up to Agent Linscott and informed him, "my sister is under the boat." Agent Linscott then yelled out to everyone, "There's someone under the boat." There were multiple people sitting atop the boat at the time. About two to three minutes passed until the woman was out from under the boat, and Agent Linscott administered CPR once she was aboard the M901.

**Testimony of Roger Clark**

Roger Clark, a veteran civilian law enforcement officer who retired from the Los Angeles County Sheriff's Office in 1993, testified as an expert on police "use of force" as reflected in Police Officers Standards and Training ("POST"), standards which have been adopted by law enforcement agencies in the State of California. Mr. Clark largely compared the actions taken by the M901 crew in its interdiction of the panga to POST standards and reached several opinions. Initially, Mr. Clark opined that although the MWS did not constitute lethal force, the MDS were potentially lethal. Recognizing that POST does not deal with maritime interdiction of smuggling vessels by federal law enforcement agencies, Mr. Clark further observed that there exists a risk of even a straight MDS causing injury from sprayed fragments and that such a vessel may become uncontrollable. Therefore, Mr. Clark testified, "you do not [use MDS] unless there are extreme reasons," which Mr. Clark found not to exist in this case. Mr. Clark reached his ultimate conclusion that the firing of MDS (and possibly MWS) was not appropriate under the totality of circumstances and that the M901 should have "uttered its authority" and brought in "other resources" before using a shotgun.

/ / /

/ / /

In reaching his primary conclusions, Mr. Clark had reviewed and considered to be "reasonable" the U.S. Customs and Border Protection OAM[4] Tactics, Techniques, and Procedures for the Use of Force Policy, Guidelines and Procedures Handbook of USCBP ("OAM Manual") and its relevant protection directives.[5]

On cross-examination, Mr. Clark acknowledged he had no prior experience with law enforcement vessels, or maritime enforcement, training, or interdiction. He also acknowledged he was aware panga passengers heard a "verbal command [from M901]," and that the panga driver refused to stop while "laughing and barking like a dog and smoking something that smelled bad."

Finally, on cross-examination, Mr. Clark testified that although he was aware "federal statutes" allow for pursuit in a case such as this, he trusted counsel's direction that the officers had authority to stop the smuggling and that "use of force is the same", i.e. officers must use good judgment and that the "Graham v. Connor factors" apply.[6]

**Testimony of Martha Franco Jimenez**

Martha Franco Jimenez, the mother of decedent Graciela Lopez Franco, testified her daughter was one of eleven children, was 32 years of age at the time of her death, and lived with her parents. Ms. Franco contributed 500 pesos per week to her parents for home expenses.

**Testimony of Sylvia Lopez Hernandez**

Ms. Lopez Hernandez, the sister of decedent Graciela Lopez Franco, testified the decedent's education reached the second semester of college and that Ms. Franco had held various jobs, including the rental of computers in a cyber café and doing payroll.

---

[4]"OAM" is the acronym for Office of Air and Marine.

[5]Mr. Clark also observed, without citing any experience or authority, the M901 crew should have rescued the individual trapped under the panga before other persons.

[6]This is a reference to the seminal case of Graham v. Connor, 490 U.S. 386 (1989) setting forth the many factors that apply in a federal civil rights action (42 U.S.C. §1983) claiming excessive force by law enforcement under the Fourth Amendment. See Jury Instruction 9.25 Manual of Model Civil Jury Instructions.

Ms. Franco also had a small store with her sister and lived with her parents. Ms. Franco provided financial support to her parents and was going to the United States to work.

**Testimony of Hector Lopez Garcia**

Mr. Hector Garcia testified he was aboard the panga, "crossing illegally," when he "saw lights" and the fellow next to him said, "we have been caught." The panga driver accelerated when Hector Garcia tried to "take the throttle." The driver told Hector Garcia to duck down as "bullets were flying above." The driver was "laughing and barking like a dog. . . maybe he was doing drugs, I don't know."

Hector Garcia testified that the panga driver, who had a "tear-drop tattoo under his eye and was smoking something when we left," put the lives of the passengers in danger. When Hector Garcia ducked down, "–that's when the accident happened, as the 'Government boat' passed over. Everyone started jumping into the water and the nose [of the panga] flipped up toward [where Hector Garcia was seated]. All were in the water and people began boarding the [M901]."

Hector Garcia and his brother were the last ones to board. They and others told the agents Ms. Franco was missing. "They said maybe she's under the boat." Hector Garcia saw one man sitting on the boat.

Mr. Lopez Garcia testified he suffered fractured ribs, as well as cuts from the M901 propeller on his arm, head, hand and face, and lost a tooth.

**Testimony of Luis Lopez Garcia**

Luis Garcia, the younger brother of Hector Garcia, testified consistently with the testimony of his brother up to when the M901 came into the area. At that time, Luis Garcia heard a siren and saw reflections of flares. He then heard gunshots–or loud bangs–after the flares. People in the panga started screaming as several gunshots sounded and the sound of the panga motor changed. There were nineteen people in the back of the boat, which was Luis Garcia's position.

Luis Garcia testified the Government vessel "came over top." He "noticed some water in the boat, not a lot." Then he saw people jumping into the ocean. As the front

end of the boat came up, the boat flipped.  Luis Garcia was under the boat and scared as he could not swim.  His brother, Hector, "pushed out from under the panga and the two of [them] were the last two on board [the M901]."  Luis Garcia received various cuts requiring stitches and lost a tooth.

Upon questioning from the court, Mr. Lopez Garcia testified he heard a siren from the "police boat" and a voice over the loudspeaker between sirens.

**Testimony of Mark Levan**

Customs and Border Protection ("CBP") marine interdiction agent Mark Levan was called by the Government as a maritime interdiction expert with experience in CBP air and marine operations.  Since 2010, he has simultaneously been a marine interdiction agent and a supervisory marine interdiction agent and has served as a vessel commander and cover officer, but not a shooter.

The SBIP came into being in about 2002, and its procedures and programs are set forth in the OAM Manual.[7]  With respect to MDS, "closer is better" is the principle that applies when disabling a boat.  Agents are taught that a range up to 25 yards from the target is approved, "but one foot is better.  The closer you are, the more accurate you're likely to be."

Agent Levan testified that the procedure he described, and that which was employed in this case, has been used 139 times (including 39 times in the San Diego Region) without any previous serious injury or death.  Moreover, a MDS has never hit a person.

Agent Levan testified that a reasonable crew member is one who exercises judgment assessing the totality of circumstances.  Factors to be considered for use of MWS and MDS include whether the subject vessel poses an immediate threat to the M901 crew and whether lights and sirens have had an effect. Is the vessel dark?  What does the TAP indicate?  Letting a scene "play out" increases a risk or threat.  There have been 3-4 cases of suspects opening fire or throwing gas, bottles or responding with

[7]Exhibit M at trial.

machetes. "The faster the pursuit can be ended, the safer it is for everyone. . . and continuing to chase degrades the safety of everyone."

Agent Levan further testified, "Failure to 'heave to' is a felony." He also stated that 40% of panga drivers are under the influence of some kind of drug.

On cross-examination, Agent Levan acknowledged he has worked with Agent Hunter for two years and knows all three crew members of the M901 in this case. The OAM Manual advises there exists "a high degree of risk" from MWS and MDS. When asked about section 8.2.5 of the OAM Manual and its reference to the use of "all available means (i.e., visual, audible, radio contact) to hail a suspect vessel prior to the deployment of MWS/MDS," Agent Levan testified, "policy does not require voice command to hail."

Agent Levan testified he has interdicted thousands of vessels and only used MDS once. "Boats stop when only lights and sirens come on." Agent Levan has only used a loudspeaker to hail a vessel on one occasion between 2002-2014.

**Deposition Testimony of Jacobo Zaragosa**

Mr. Zaragosa, a passenger aboard the panga, became aware of another boat when a spotlight came on. He then, "heard them yell out something. . . [which] he didn't understand. Two flares went up after the light came on." Mr. Zaragosa heard two shots, heard an impact, and the motor of the boat "went off, the speed went down and it started to stop." Mr. Zaragosa crouched down. After the panga stopped, the M901 came and scraped the panga's side . . . "it hit us and went over us." One piece of the panga broke off into little pieces.

After the collision, there was a lot of confusion and Mr. Zaragosa fell into the water. Another person "was sinking." "People in the [M901] started yelling at us to come toward them, but it was little far." At some point, the relatives of Ms. Franco could not find her. Someone said, "maybe she's under the panga that's flipped over." At that point, the flipped-over panga was very close to the M901. She was pulled onto the boat and CPR was tried.

**Deposition Testimony of Luis Valdez**

Mr. Valdez, another passenger aboard the panga, became aware of a big spotlight at a distance of about 250 meters, that lit up the whole area. At that point Mr. Valdez "thought it was immigration." Mr. Valdez then saw the red balls from flares go up from a distance of 30-40 meters. Then, the M901 came by the side of the panga and started shooting until the motor was hit.

Mr. Valdez described the shotgun rounds directed at the panga motor, and the panga slowing after the MDS. He then described the M901 going over the panga so that it was about one foot over Mr. Valdez's head. The panga flipped over and Mr. Valdez got on top of it. The M901 reversed and slowly returned. People were yelling for help. Mr. Valdez estimated he was on top of the panga for about ten minutes. Two other people had also gotten to the top of the panga. Then someone began calling for Ms. Franco. Someone said she was under the boat. One of the officers from the boat was trying with others to lift the panga when Ms. Franco was lifted onto the M901. The officers did CPR for about forty minutes.

**Deposition of Alberto Vazquez**

Mr. Vazquez, another panga passenger, first became aware of the "interception boat" when "it came out of nowhere. . . and illuminated us with a strong light. Next, blue patrol lights came on." Then, Mr. Vazquez heard the officer say in English, "Stop the boat." The command "sounded like it came over a speaker. That's why I heard it." At that time, "they threw a light up, like an emergency flare." At that point, the panga driver also sped up and started laughing.

Mr. Vazquez described the collision of the boats as did Mr. Valdez, and testified that he was one of three people atop the capsized panga. Mr. Vazquez did not see any of the officers lift the panga. Mr. Vazquez did not give any estimate of the length of time Ms. Franco was under the panga before she was discovered.

/ / /

/ / /

# DISCUSSION

## Legal Standards

The United States Constitution grants original jurisdiction to federal courts to hear admiralty claims. <u>See</u> U. S. Const. Art. III, § 2, cl. 1. This jurisdiction, codified at 28 U.S.C. § 1331(1), allows the filing of claims related to maritime torts. As such, general maritime law applies. <u>East River S.S. Corp. v. Transamerica Delaval, Inc.</u>, 476 U.S. 858, 864 (1985). "Drawn from state and federal sources, the general maritime law is an amalgam of traditional common law rules, modifications of those rules, and newly created rules." <u>Id.</u> at 864–65.

## Limitation of Liability Act ("LOLA")

This admiralty action has been filed by the Government as the owner of a CBP vessel (M901) that collided with a panga smuggling approximately 20 undocumented immigrants from the Republic of Mexico to the United States. The collision occurred approximately twelve miles offshore from the City of Encinitas, County of San Diego. One panga passenger died from drowning after the collision and two other passengers sustained personal injuries. The claims in this action arise from the death and injuries mentioned.

The Government's action was filed under the Limitation of Liability Act ("LOLA"), U.S.C. §§ 30505, et seq., which the parties agree provides the procedural framework for resolving the underlying claims. Those procedures are described in <u>In re Complaint of Ross Island Sand and Gravel</u>, 226 F. 3d 1015, 1017 (9th Cir. 2000):

> To take advantage of this provision, owners must first file a complaint in the district court, and then deposit an amount with the court that is the equivalent of their interest in the vessel. <u>See</u> Fed. R. Civ. P. Supp. R. F(1). The district court then notices all potential claimants and requires them to file claims with the court within a specified time, and issues an injunction that prevents the filing of any other actions against the owner if it involves related claims. <u>See</u> Supp. R. F (3) & (4).

Here, the Government has complied in that the parties agree it is exempt from depositing the value of the M901 (approximately $458,000) into the court's registry.

/ / /

The next step is to adjudicate the merits of the LOLA issues by means of bench trial. A burden-shifting framework applies under LOLA:

> First, the party seeking to recover damages must demonstrate the ship-owner's liability for its loss, . . . by showing . . .the negligence of the vessel's crew. See In re BOWFIN M/V, 339 F. 3d 1137, 1138 (9th Cir. 2003) (per curium); In re Hechinger, 890 F. 2d 202, 207 (9th Cir. 1989). A vessel owner's admission of liability is not alone sufficient to satisfy the claimant's burden of proof; rather "[t]he claimant retains the burden of proving what act caused the loss even if the shipowner concedes that its crew was negligent. BOWFIN, 339 F.3d at 1138.
>
> Once the claimant establishes the particular cause of loss or damage the vessel owner is entitled to limit its liability only if the vessel owner then successfully demonstrate it ...[lacked] knowledge of...the act or negligence that caused the accident. Id. "Privity or knowledge" may be actual or constructive; therefore, in addition to showing a lack of actual knowledge or the cause of whatever means of knowledge are reasonably necessary to prevent conditions likely to cause losses." Waterman S.S. Corp. V. Gay Cottons, 414 F. 2d 724, 732 (9th Cir. 1969; see also States S.S. Co. V. United States, 259 F. 2d 458, 466 (9th Cir. 1957) ("'[K]nowledge means not only personal cognizance but also the means of knowledge-of which the owner or his superintendent is bound to avail himself-of contemplated loss or condition likely to produce or contribute to loss....'")

Matter of Mission Bay Jet Sports, LLC, 2010 WL 11618156, at *4 (S.D. Cal. Aug. 3, 2010) (quoting Washington State Dep't of Transp. v. Sea Coast Towing Inc., 148 F. App'x 612, 613–14 (9th Cir. 2005)). "Privity is fault or neglect in which the vessel owner personally participated." Coryell v. Phipps, 317 U.S. 406, 409 (1943).

If a claimant fails to establish liability, the shipowner is entitled to exoneration, which is the functional equivalent of judgment in its favor. See In the Matter of Hechinger, 890 F.2d 202 (9th Cir. 1989), cert denied, 498 U.S. 848 (1990).

If a claimant establishes liability and the shipowner establishes limitation of liability, then liability is limited to the value of the vessel. See id.

**Statutes Conferring Subject Matter Jurisdiction**

The parties essentially agree that subject matter jurisdiction is conferred through the interplay between the Government's limited waiver of sovereign immunity as set forth in the Public Vessels Act ("PVA"), 46 U.S.C. §§ 31101, et seq., the Suits in Admiralty Act ("SAA"), 46 U.S.C. §§ 3090, et seq., and the Federal Tort Claims Act

("FTCA"), 28 U.S.C. § 2674, et seq.  As outlined in <u>Tagbadomi v. United States</u>, 401 F.3d 1080 (9th Cir. 2005):

> The United States, of course, is liable in court only when it has waived its sovereign immunity.  Three immunity-waiving statutes are relevant here. The first is the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2674, et seq., which generally renders the United States liable for its torts to the same extent as a private actor.  The FTCA includes an exception, however, for "[a]ny claim for which a remedy is provided" by either of the other two statutes relevant to this case. 28 U.S.C. §2680.  These are the Public Vessels Act ("PVA"), 46 U.S.C. App. §781 et seq., and the Suits in Admiralty Act ("SAA"), 46 U.S.C. App. §741 et seq.

Id. at 1082–1083.  <u>See also</u> <u>Tobar v. U.S.</u>, 731 F.3d 938, 944 (9th Cir. 2013).

## Substantive Maritime Claim

The prima facia elements of a negligence cause of action under maritime law are duty, breach of duty, proximate causation, and damages.  <u>See</u> <u>Pearce v. United States</u>, 261 F.3d 643, 647 (6th Cir. 2001) (noting that general admiralty law, not state law, governs tort claims arising from injuries in territorial waters.); <u>Withhart v. Otto Candles, L.L.C.</u>, 431 F.3d 840, 842 (5th Cir. 2005).

## Sovereign Immunity for Discretionary Acts

As noted most recently by the Ninth Circuit:

> The FTCA waives the government's sovereign immunity for tort claims arising out of negligent conduct of government employees acting within the scope of employment. 28 U.S.C. § 1346(b)(1).  This waiver allows the government to be sued "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." Id.  And, of course, if there is no waiver, the court lacks subject matter jurisdiction, an issue that we review de novo.  <u>GATX/Airlog Co. United States</u>, 286 F.3d 1168, 1173 (9th Cir. 2002).
>
> One exception to this broad waiver of sovereign immunity, called the discretionary function exception, provides immunity from suit for "[a]ny claim. . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the government whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

<u>Morales v. United States</u>, 2018 DJDAR 6881, 6882 (9th Cir. July 16, 2018).

Notably, the discretionary function exception to sovereign immunity waiver has been recognized to apply to admiralty cases under the PVA:

Neither the SAA nor the PVA expressly contains the "discretionary function exception." Nevertheless, in Earles v. United States, 935 F.2d 1028, 1032 (9th Cir. 1991), we joined eight sister circuits in holding that the exception applies to claims brought under the SAA. "Were we to find the discretionary function exception not to be applicable to the SAA, we would subject all administrative and legislative decisions concerning the public interest in maritime matters to independent judicial review in the not unlikely event that the implementation of those policy judgments were to cause private injuries." Id. (internal quotation marks and alterations omitted). The same reasoning applies to claims under PVA: If Congress' intent to exempt discretionary functions from independent judicial review is given effect, the discretionary function exception must apply to the PVA as well. CF Koohi v. United States, 976 F.2d 1328 (9th Cir. 1992) (incorporating the FTCA's "combatant activities" exception into the PVA because, "if Congress's manifest intent to maintain sovereign immunity from liability arising from the combatant activities of maritime vessels is to be given meaningful effect, the combatant activities exception must be incorporated into the PVA").

Not surprisingly, then, all three sister circuits to have considered the issue have held that the discretionary function exception applies to claims under the PVA. [citations omitted] We join our sister circuits in holding that the discretionary function exception also applies to the PVA's waiver of sovereign immunity.

Tobar v. United States, 731 F.3d 938, 945 (9th Cir. 2013)

The two-step process to determine whether the discretionary function exception is to apply is predicated upon clear Supreme Court authority as cogently expressed in Morales:

The Supreme Court established a two-step process to determine the applicability of the exception. See Berkovitz v. United States, 486 U.S. 531, 536 (1988). We determine first whether the act is "discretionary in nature", which necessarily involves an "'element of judgment or choice.'" United States v. Gaubert, 499 U.S. 315, 322 (1991) (quoting Berkovitz, 486 U.S. at 536). The "judgment or choice" requirement is not met where a "federal statute, regulation or policy specifically prescribes a course of action for an employee to follow." Berkovitz, 486 U.S. at 536. "If there is such a statute or policy directing mandatory and specific action, the inquiry comes to an end because there can be no element of discretion when an employee 'has no rightful option but to adhere to the directive.'" Terbush v. United States, 516 F.3d 1125, 1129 (9th Cir. 2008) (quoting Berkovitz, 486 U.S. at 536).

If discretion is involved, then we consider whether the discretion "is of the kind that the discretionary function exception was designed to shield" – namely, "only governmental actions and decisions based on considerations of public policy." Berkovitz, 486 U.S. at 536–37(citation and internal quotation marks omitted). "Public policy" has been understood to mean considerations "grounded in social, economic, and political policy.." Varig Airlines, 467 U.S. at 814. The focus is on whether the actions are "susceptible to a policy analysis," not whether the government actually took such

public policy judgements into consideration when making the decision. Miller v. United States, 163 F.3d 591, 593 (9th Cir. 1998).

2018 DJDAR at 6882-83.

## **FINDINGS AND ANALYSIS**

The application of LOLA to the present case requires the court to address issues of negligence and causation utilizing principles of maritime law as cabined the PVA, the SAA, and the FTCA.

Notably, the FTCA allows for governmental tort liability arising from the negligence of government employees only to the extent private persons would be liable for the same acts or omissions. What, then, are the standards by which the conduct of maritime agents of the United States Border Patrol is to be judged during interdiction of smuggling activity? Logically, the standard cannot be simple or garden variety negligence. The hypothetical reasonable "private person" would lack the authority and training to enforce federal law proscribing human smuggling and would be helpless in attempting to do so. Moreover, POST standards, the substantive platform primarily utilized by claimants' "expert," Roger Clark, do not deal with maritime interdiction of smuggling vessels.[8]

The court finds the standards by which the crew of the M901 are to be judged in this case consist of the policies and operational guidelines of the OAM Manual. These policies and operational guidelines provide the framework for interdiction of a target vessel, such as a panga smuggling human cargo. This finding is buttressed by the reliance of all parties upon these policies and guidelines when examining witnesses and arguing whether compliance was achieved by the crew of the M901.

It is undisputed that from the time the subject panga was first detected in the late evening of June 17, 2015, as it departed from Mexico, until about 2:00 a.m. on June 18,

---

[8]The court finds Mr. Clark's testimony to be of minimal assistance in its liability analysis. As mentioned, POST standards are irrelevant, as was Mr. Clark's law enforcement experience, which was devoid of any maritime enforcement activity. To the extent Mr. Clark reviewed and considered the relevant portions of the OAM Manual to be "reasonable," implying that they enumerate the "totality of circumstances" to be considered, his testimony is relevant.

when the crew of the M901 first observed the panga about twelve miles offshore Encinitas, Government assets and law enforcement personnel were engaged in lawful smuggling detection and interdiction activity. It is also undisputed that once the crew of the M901 observed the panga, they were legally authorized to conduct interdiction operations pursuant to Policy and Operational Guidelines set forth in the OAM Manual, the relevant portions of which are set forth as follows:

8.2 POLICY - OPERATIONAL GUIDELINES

8.2.1 Any use of MWS/MDF must be consistent with law and governing DHS and CBP use of force policy and the reasonableness of its use must be judged from the perspective of a reasonable officer on the scene in light of the totality of the circumstances, especially the following use of force factors.

    a.    Whether the subject vessel poses an immediate threat to the safety of the officers/agents or others;

    b.    Whether the subject is actively resisting seizure or attempting to evade arrest by flight;

    c.    The severity of the crime at issue;

    d.    Whether the circumstances are tense, uncertain and rapidly evolving; and

    e.    The foreseeable risk of injury to involved subjects and others.

8.2.3 MWS/MDF shall be deployed only by CBP trained and certified law enforcement personnel, and only in accordance with DHS and CBP policy, including the Use of Force Handbook, CBP OAM MWS/MDF Standard Operating Procedures (SOPs) and this policy.

8.2.5 CBP vessels conducting MWS/MDF operations must:

    a.    Be conspicuously marked as CBP vessels;

    b.    Use all available means (i.e. visual, audible, radio contact) to hail a suspect vessel prior to the deployment of MWS/MDF; and,

    c.    Establish a failure to yield prior to the deployment of MWS/MDF.

8.2.6 Any pursuit of a vessel first encountered within the Customs waters of the United States and then leaves the Customs waters of the United States that results in the use of MWS/MDF must be continuous.

8.2.7 MWS/MDF shall not be used against vessels that are stopped or that appear to be in the process of stopping, unless the shooter can articulate non-compliance by the vessel's crew.

8.2.9 A minimum of two properly placed warning shots must be fired prior to deploying disabling fire. NOTE: Warning shots fired by another Agency do not fulfill CBP's warning shot requirement.

15cv2626

8.2.11 MWS and MDF shall only be deployed in open waters and shall not be utilized in situations where CBP law enforcement personnel have a reasonable belief that personal injury or death may occur. Safety shall always be the first consideration when deploying MWS/MDF.

8.2.12 Open water MWS are to be used as a signaling device after all other available means of signaling have failed (i.e. use of flashing lights, acoustic hailing device, etc.). They are considered a signaling device intended to gain the attention and compliance of a non-compliant vessel.

8.2.13 MDF shall only be deployed when a suspect vessel fails to stop, after all other available signaling, including MWS, has been exhausted and failed. The VC may then authorize the use of MDF to stop a non-compliant vessel.

Additionally, the following training (or instructional guidelines) are material to the analysis:

Marine Warning Shot/Marine Disabling Fire: Vessel Commander Mindset
* Marine Warning Shot (MWS) and Marine Disabling Fire (MDF) are deployed in rapidly-changing conditions.
* There is a high degree of risk.
* VCs must make good decisions in evolving conditions.
* Decisions must be made calmly.
* VCs using stress management techniques make better decisions and lower reaction time.

Marine Warning Shot/Marine Disabling Fire – MDF Procedures for Vessel Commanders

1. Do not move vessel out of TAP until shooter is ready (command repeated). "Standing by disabling fire."
2. When moving into MDF position, VC should monitor the course and speed of TOI and make necessary adjustments
3. Establish MDF position quickly and smoothly, paralleling course and matching speed of TOI (closer is better principal [sic])
4. Give "clear to fire command" ASAP when moving out of TAP

*Additional information*: MDF position can be described as a position the enforcement vessel should establish and maintain when delivering MDF towards the propulsion of a noncompliant target of interest (TOI). The MDF position will be forward of the engines of the target vessel to a point where the designated shooter will be 90 degrees from the intended target and inside 25 yards of a line parallel with the course of the TOI. Given scene circumstances, erratic maneuvering or capability of erratic maneuvering by the target vessel, this position may require numerous throttle and rudder adjustments to maintain. When establishing this position, "closer is better" is the goal as this will reduce force if contact between vessels does occur. An MDF designated shooter will only fire when he or she has a 90 degree target angle and reasonably believes that the round will not cause personal injury or death.

19

Notwithstanding the varying time estimates from witnesses between the M901's first sighting of the panga and the collision, approximately 94 seconds elapsed between initial action taken by the M901 and the collision as established by reliable GPS tracking. That initial interdiction action consisted of emergency lights and siren being activated aboard the M901 from a distance of approximately 25 yards until the M901 drew even closer. Although some panga passengers estimated the initial distance between the vessels to be greater, the M901 was close enough behind the panga for VC Hunter to observe the panga driver look back in response to the lights and siren and then accelerate in an effort to elude apprehension.

While each of the three agents aboard the M901 testified that he did not, or could not recall anyone using the on-board loudspeaker to hail the panga, the clear consensus of the panga passengers was that a loudspeaker was in fact used with a warning to "stop the boat." One panga passenger testified the warning came between the wails of the siren. The preponderance of evidence supports the court's finding that the loudspeaker aboard the M901 was used to hail the panga without effect. The court further finds that any decision (or failure) not to use the loudspeaker did not in any way alter the circumstances of the panga's interdiction. All aboard the panga were aware of the lights and siren and that they had "been caught." The use or non-use of a loudspeaker would not have caused the panga to heave to. The clear intent of the panga driver was to elude the M901 and avoid interdiction.

Following the M901's futile efforts to stop the panga by lights and siren (and voice command), VC Hunter gave the order for MWS, or flares, to be deployed. These "explosions in the sky," as one panga passenger recounted, were clearly visible and, again, had no effect on the panga driver who, it was suggested by some passengers, was laughing and barking, and was clearly undaunted by the interdiction efforts.

The weight of the evidence clearly establishes that the crew of the M901 fully complied with the OAM policies and guidelines at all times in their contact with and interdiction of the panga, i.e., the target of interest. Initially, the M901 secured a

position to the rear of the panga, outside its wake, and within proper hailing distance. Initial hailing efforts consisted of illuminating the panga and activating emergency lights and siren. Claimants vigorously argued at trial that the M901 crew fell short of required hailing efforts based on the inability of any crew member to recall using or hearing the loudspeaker aboard the M901. This argument elides two important points. First, several panga passengers clearly heard the loudspeaker during the time emergency lights and siren were in use, with one passenger hearing the words, "stop the boat," over the speaker. Based on that collective testimony alone, the court concludes the loudspeaker of the M901 was used to hail the panga, notwithstanding the crew could not recall doing so. Second, even assuming the loudspeaker had not been used to hail the panga, any such omission was not the cause of the panga's failure to "heave to," as previously noted. The evidence clearly and convincingly establishes that if the panga driver was not going to stop for emergency lights, siren, and MWS, he was not going to stop for an order given over a loudspeaker. Any such omission, therefore, could not have been a cause of the panga failing to heave to or of the collision that followed the pursuit.

Next, the court finds the use of MWS was virtually "textbook" and in full compliance with the policies and guidelines of the OAM Manual. Two flares were fired at the direction of the VC situated in the TAP and called out as "two good." The flares, with their explosions and reports, were clearly perceived by those aboard the panga. Again, the panga driver failed to respond and even accelerated in his effort to evade pursuit. All hailing efforts (lights, siren, and voice) were exhausted within approximately 30 seconds, after which the VC decided to use MDS.

The preparation for and execution of the MDS were in full compliance with the policies and guidelines of the OAM Manual. Essentially, VC Hunter and his crew reasonably considered the totality of circumstances as reflected in the OAM Manual, and in particular, the factors set forth in section 8.2.1. Importantly, VC Hunter decided to engage with MDS only if there was no reasonable likelihood of serious injury or death,

and did not consider just "letting [the panga] go." As reflected in the OAM Manual, that would have been against policy. See OAM Manual §8.2.6.

The totality of evidence establishes that the longer a pursuit is allowed to continue, the greater the risk of danger to the crew from weapons and thrown objects. In past cases where a vessel has made a run for shore, several immigrants have jumped into the surf and drowned. In this case, there was no question that circumstances were tense, rapidly evolving, and with reasonable cause to believe that the panga driver had committed felonies consisting of smuggling and failing to heave to.

The crew of the M901 assumed proper position for delivering MDS as set forth in the OAM Manual (Instructional Guidelines, supra). The M901 achieved a position forward of the panga engine to a point where the designated shooter was 90 degrees from the intended target and within a few feet, adhering to the "closer is better" rule and minimizing the risk of injury caused by gunfire. Due to the erratic operation of the vessel, it was necessary to secure MDS position twice, with fire from a second volley disabling the engine.

Claimants point to the 94-second period between initial hailing efforts and the disabling of the engine and suggest this was action precipitously undertaken and unreasonable under the circumstances. The court does not agree. Notably, the OAM Manual makes no reference to a suggested period of time during which hailing efforts should be undertaken before MWS and MDS are employed. To the contrary, the policies and guidelines emphasize factors to consider, risks to avoid, physical positioning to achieve, and good judgment to be exercised. The court finds that it was well within the reasonable exercise of proper interdiction activity and the relevant OAM Manual guidelines to employ hailing efforts, MWS, and MDS within a period of 94 seconds under the totality of circumstances.

The preponderance of evidence supports this court's finding that the collision between the M901 and the panga was solely caused by the erratic operation of the panga by the driver. The driver, observed by many passengers to be laughing and essentially

15cv2626

acting strangely in response to hailing measures, made a conscious effort to take evasive action which included sharp turns and, ultimately, the apparent loss of control of the panga. Somehow, the panga undercut the side of the M901, causing the M901 to "shudder." Although a piece of the panga apparently broke loose, the weight of the evidence suggests passengers congregating at the stern to jump into the water caused the bow of the panga to rise and the boat to capsize.

Estimates of the witnesses vary from one to four persons sitting atop the capsized panga hull. Estimates also vary as to how long people were atop the hull from a few minutes to ten minutes. Some things are very clear, however, from the evidence. Panic and chaos ensued after the collision and passengers were "frantic" in the water. The M901 crew were intent on rescuing people as quickly as possible by pulling them aboard the M901. After some period of time (probably several minutes) someone (probably a panga passenger) announced the "woman" aboard the panga was missing. At some point thereafter she was discovered under the panga while at least one other passenger sat atop. The M901 crew never considered jumping into the water as they had been trained that to do so would create unacceptable risks to their own safety. Rather, one or more of the crew assisted in pulling the panga closer to the M901 and pulling Ms. Franco into the vessel. By all accounts, CPR was administered for at least one half hour without Ms. Franco's resuscitation. The Garcia claimants sustained the cuts, fractures, and other injuries in, and after, the collision.

The death of Ms. Franco was indeed a tragedy. Ms. Franco was described as a loving and caring young lady, respectful, industrious, and contributing to household expenses as she lived with her parents. Her loss is no doubt profound for family and friends. The collision also resulted in real injuries to the Garcia claimants. However, this court finds that neither the death of Ms. Franco, nor the injuries of the Garcias, were

/ / /

/ / /

/ / /

15cv2626

caused by any breach of duty by the crew of the M901.[9]  As discussed above, from the time of initial hailing efforts until the collision, the crew of the M901 complied with the policies and guidelines of the OAM Manual regarding the interdiction of a smuggling vessel.  The crew considered the totality of circumstances, formulated a plan of action, and properly executed their plan pursuant to policy, best practices, established guidelines, and their training and experience.  At no time was any crew member negligent or acting contrary to OAM Manual policies and guidelines.

This court has found that no crew member of the M901 (1) was negligent in the interdiction of or collision with the subject panga; or (2) was negligent in the aftermath of the collision or in connection with the efforts to rescue Ms. Franco.  This court has further found that each crew member of the M901 complied with Government policies and guidelines for the interdiction of a smuggling vessel, such as the subject vessel, as set forth in the OAM Manual.  Subsumed in this finding is the court's conclusion that any and all force used by the crew in its interaction with the panga was reasonable and justified by the totality of circumstances.

Notwithstanding these findings result in the complete exoneration of the Government from liability under LOLA, given the briefing of the parties, the court addresses the additional question of whether the Government would be further protected by the immunity for discretionary function.  As pointed out in Morales, a two step approach to this question is involved: (1) whether the act is "discretionary in nature," i.e., whether it involves judgment or choice rather than being specifically mandated by law or policy, and (2) whether the action taken is grounded in social, economic, or political policy. See United States v. Gaubert, 499 U.S. 315, 322 (1991); Terbush v. United States, 516 F.3d 1125, 1129 (9th Cir. 2008); Miller v. United States, 163 F.3d 591, 593 (9th Cir. 1998).

---

[9]While it is uncertain whether the drowning of Ms. Franco could have been avoided had she been discovered earlier, the court concludes it was the chaos and fog of rescuing activity that delayed the discovery of Ms. Franco under the panga. Moreover, the refusal of one or more fellow panga passengers to promptly abandon their positions atop the hull served to prolong Ms. Franco's time in the water.

15cv2626

If the answer is affirmative to either of these questions, then the immunity for discretionary function applies.  See generally Tobar v. United States, 731 F. 3d 939 (9th Cir. 2013); Morales, Id.

In Gaubert, the Supreme Court delved deeply into whether and when agency decision-making at the operational level qualifies for the discretionary function.  Noting that the immunity is not confined to the "policy or planning level," the Supreme Court observed several scenarios where the discretionary function existed at the operational level. Id. at 322–326.  In United States v. Varig Airlines, 467 U.S. 797 (1984), for example, a system devised by the Federal Aviation Administration for "spot-checking" airplanes as well as agency employee action in executing the program were held to be discretionary acts.  The "range of discretion to exercise in deciding how to carry out the spot-check activity," involved discretionary functioning.  Varig Airlines, 467 U.S. at 820.  Gaubert cogently recognized the foundational ethos for the discretionary act immunity and the interlocking nature of the two step approach of Berkovitz:

> [I]f a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations.
>
> Not all agencies issue comprehensive regulations, however.  Some establish policy on a case-by-case basis. . . In any event, it will most often be true that the general aims and policies of the controlling statute will be evident from its text.

Gaubert, 499 U.S. at 324.

Based on these guiding principles, the court concludes that each of the two steps articulated in Berkovitz independently support this court's finding that the crew of the M901 exercised discretion in the execution of the interdiction.

Beginning with the statute authorizing interdiction of the type envisioned for and exercised by the M901 crew in this case, we see that element of discretion to be exercised on a case-by-case basis. Title 19 U.S.C. § 1581(d) speaks to discretion to "use all necessary force to compel compliance."

15cv2626

The OAM guidelines and agency training provide that decisions regarding interdiction and the use of force must be reasonable, taking into account the totality of circumstances, including threat assessments, risk of flight, severity of the underlying crime, the intensity and speed of evolving events, and risks of injury. VCs are directed to make good decisions in a calm manner.

Clearly the underlying statute and these agency guidelines present a quintessential example of discretionary functioning at the operational level. Elements of judgment and choice are the ingredients for how and under what circumstances an interdiction is to take place. Step one of the Berkovitz approach, alone, sufficiently justifies this court's finding that the action taken by the M901 excepted the Government form liability under the FTCA.

Moreover, the court finds that step two of Berkovitz equally applies to immunize the Government in this case. As was the case in Tobar, which immunized the Government for discretion exercised by a Coast Guard crew in boarding, inspecting and towing a ship which was damaged in the process, the decision for the M901 crew to interdict the panga in the manner they did is covered by discretionary immunity. The Tobar court found the action of the Coast Guard involved considerations of domestic drug enforcement weighed against concerns of privacy, foreign relations, and the costs of boarding and searching a ship. These concerns relate to law enforcement policy and claims based upon such action were deemed barred by discretionary immunity. By parity of reasoning, the action taken by the M901 were predicated upon enforcement of federal immigration law, utilizing limited federal resources dedicated to controlling what is understood to be an area of national concern.

In sum, the action taken by the M901 crew to interdict the subject panga during the early morning hours of June 18, 2015, involved discretionary function which triggered the immunity exception of the FTCA under each of the two prongs enumerated in Berkovitz.

/ / /

15cv2626

# CONCLUSION

The court concludes the action taken by the M901 crew was lawful in all respects and complied with all relevant statutes, regulations, and guidelines issued by United States Customs and Border Protection, as set forth in the OAM Manual. None of the actions of the M901 crew were negligent or violated any duty or standard of care owed to claimants. The court further concludes the collision between the M901 and the panga was solely caused by operation of the panga and the failure of its driver to heave to and yield to the authorities. No action of the crew of the M901 caused the drowning death of Ms. Franco or the injuries sustained by the Garcia claimants. The Government is entitled to a judgment exonerating it from liability regarding the collision between the M901 and the subject panga. The Government is to prepare a Judgment.

IT IS SO ORDERED.

DATED: August 3, 2018

Hon. Jeffrey T. Miller
United States District Judge

15cv2626